HIGHLY CONFIDENTIAL – SOURCE CODE

1    [Counsel for All Parties Listed on Signature Page]

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                          NORTHERN DISTRICT OF CALIFORNIA

10                                SAN JOSE DIVISION

11   SOFTWARE RIGHTS ARCHIVE, LLC,        )    No. 12-CV-3970 RMW
                                          )
12           Plaintiff,                   )    **DISCOVERY DISPUTE JOINT**
                                          )    **REPORT #2:**
13        v.                              )    **INTERROGATORY NO. 1**
                                          )    **(SUBPARTS A, C, D AND G)**
14   FACEBOOK, INC.,                      )
                                          )
15           Defendant.                   )
                                          )
16                                        )
                                          )
17

18   **Issue:**  Plaintiff Software Rights Archive, LLC ("SRA") respectfully requests an order requiring
     that Defendant Facebook, Inc. ("Facebook") supplement its response to SRA's Interrogatory No. 1
19   (subparts A, C, D and G).  Facebook opposes SRA's motion and requests that its objections to
     Interrogatory No. 1 be sustained.
20
     **Joint Meeting:**  The parties exchanged written correspondence discussing their positions and held
21   a joint meeting telephonically, attended by lead counsel on May 15, 2013 for 30 minutes.

22   **Close of Claim Construction Discovery:**  November 8, 2013 (No other discovery dates set).

23   **Attestations of Lead Counsel:**  Lead counsel hereby certify that they have complied with Judge
     Lloyd's Standing Order re Discovery Disputes, as made applicable to this action pursuant to the
24   Court's Order of January 28, 2013.  (Dkt. 39, at 4.)

25        */s/  Victor G. Hardy*                    */s/  Heidi Keefe*
             Victor G. Hardy                          Heidi Keefe
26

27

28

HIGHLY CONFIDENTIAL – SOURCE CODE

**Plaintiff's Position**

I.     **Introduction**

This discovery dispute arises out of Facebook's refusal to respond adequately to SRA's Interrogatory No. 1 (subparts A, C, D and G), as well as to respond to any other form of technical discovery, beyond the production of 160 million lines of source code without adequate citations to responsive information and some general technical documents as a Rule 33(d) response. Interrogatory No. 1 asks Facebook to identify the relevant search "features" and other values used by each of the accused Facebook search systems, as well as additional information on the relevant source code variable names and the system that uses each feature and other values.  The primary purposes of Interrogatory No. 1 is to obtain basic information to allow SRA the means to decipher Facebook's source code.

In response to Interrogatory No. 1, Facebook referred SRA to Facebook's source code without any citations to the source code.  *See* Ex. 1.  In good faith, SRA attempted to ascertain the information sought by its interrogatory by now over 1400 hours or work and hundreds of thousands of dollars on source code review.  Despite this effort, SRA still has not located the responsive information.  *See* Bosch Decl., ¶¶15–18.[1]  Nevertheless, Facebook continues to refuse to either answer Interrogatory No. 1 or identify where within the 160 million lines of code that the responsive information can be found, as it is obligated to do under the Federal Rules.  Facebook further refused to conduct an informal meeting between SRA's experts and Facebook's technical personnel to assist in SRA's location of responsive information or to address any ambiguity in SRA's discovery requests.

Facebook even refused to respond to SRA's interrogatory for a limited set of features and other values that SRA identified through months of source code review in an attempt to focus Facebook on the most important signals/features to SRA.  *See* Appendix A for a list of identified features.  Facebook also is resisting putting up witnesses for questioning about the subject matter of Interrogatory No. 1.  In short, Facebook is resisting **all** efforts to obtain information necessary to enable an effective review of its source code.  SRA continues to review code without even knowing all of the variable names of the relevant search features and other values, attempting to garner as much information as it can in the face of Facebook's discovery violations.

After months of searching for responsive information in vain, it was recently discovered that one of the reasons why SRA could not locate responsive information for its "████████" analysis and other systems was that Facebook had not produced the machine learned "models" that describe how each search feature and other factor is combined in calculating the rank.  This portion of Facebook's systems describes the inputs that are actually used in calculating a "coefficient" score and its serving systems.  *See* Bosch Decl., ¶¶19–21.  In other words, Facebook has withheld the key portion of the code that is actually partially responsive to Interrogatory No. 1, forcing SRA to waste its limited time before amended infringement contention are due and financial resources searching for months for something that has not been provided.  Further, even if Facebook produces the missing "model" that code will not identify the other relevant search features and the search systems that are unaddressed by the model—which is the overwhelming majority of them.

---

[1]   Plaintiff is moving for leave for the Court to consider the Declaration of Greg Bosch, one of SRA's source code experts, for purposes of describing SRA's efforts to date in reviewing the provided source code as well as the technical difficulty of ascertaining responsive information from the provided source code.

## II.    This Court Should Compel Facebook to Respond to Interrogatory No. 1

The patents-in-suit are directed to enhancing computerized search by using or analyzing certain "indirect relationships" between electronic objects that are based upon textual and hyperlink references (*i.e.*, direct relationships) contained within objects.  *See, e.g.*, U. S. Patent No. 5,544,352, claim 26.  These direct relationships (as well as the indirect relationships) are reflected in numerical values used by the system.  Within the industry, these types of numerical values are often referred to as "signals, features, inputs, ranks, algorithms and factors."  Facebook's internal documentation repeatedly uses at least the terms "features" or "scores" to refer to such values.  *See* FB-SRA0000407 and Bosch Decl., ¶15.

**Subparts A and C** of Ex. 1 are calculated to enable SRA's infringement analyses of the code by identifying <u>all</u> variable names that correspond to each of the "features" and other values considered by the search systems as well as those "features" and other analyses based upon the accused direct relationships of "friends, fans, and likes" (*i.e.*, "link data").  Such identification is necessary for SRA to analyze the code corresponding to features that use link data.

Defendant's Fed. R. Civ. P. 33(d) response to Interrogatory No. 1 is not proper here for two reasons.  First, it technical documents do not provide the requested information.  The limited, very high level, non-code, technical documents produced by Facebook reveal that it is in fact calculating values that analyze indirect relationships.  However, with a few exceptions, Facebook's produced documents do not identify all the variables that correspond to these analyses so that SRA may locate them in the code or understand how they are calculated.  Nor do the technical documents state which search systems in fact use these analyses or even whether these analyses are actually used by search systems at all (for example, as compared to mere experimental use).  *See* Bosch Decl., ¶¶10–11.

Second, independent from the fact that much of the most relevant code was withheld from SRA, the naked code as a whole cannot and does not provide sufficiently responsive information.  Rule 33(d) allows a party to provide documents in lieu of providing a narrative response to an interrogatory "if the burden of deriving or ascertaining the answer will be substantially the same for either party" and the records are identified "in sufficient detail to enable the **interrogating party to locate and identify them as readily as the responding party could**."  Neither of these requirements are met by just referring to the entire code base.  Courts have repeatedly found that the mere provision of unreferenced source code is not a proper Rule 33(d) response to interrogatories.  *See FatPipe Networks India Ltd. v. XRoads Networks, Inc.*, No. 2:09-cv-186, 2010 WL 3064369 (D. Utah Aug. 3, 2010) ("Rule 33(d) allows a responding party to produce business records by 'specifying the records that must be reviewed, *in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could*.' Providing the entire source code and expecting the requesting party to discern the function of each line of code is not a sufficient response.").[2]  Similarly, merely referencing 160 million lines of code is not sufficient.  To the extent that Facebook seeks to rely upon source code as a Rule 33(d) response, it must identify the specific pages that are responsive to each interrogatory subpart.  *See Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 2007 WL 1514876, at \*5 (N.D. Cal. May 21, 2007) ("Any interrogatory response made under Rule 33(d) of the Federal Rules of Civil

---

[2] *See Avila v. Willits Environmental Trust*, 2008 WL 2705015, at \*3 (N.D. Cal. 2008); *Bigband Networks, Inc. v. Imagine Communications, Inc.*, 2010 WL 2898288, at \*2 (D. Del. 2010) ("in this situation, the burden of providing greater specificity is not substantially the same between the parties because [defendant] has extensive knowledge of its own source code means."); *Laserdynamics, Inc. v. Asus Computer Int'l*, No. 2:06–CV–348, 2009 WL 153161, at \*2 (E.D. Tex. Jan. 21, 2009).

HIGHLY CONFIDENTIAL – SOURCE CODE

Procedure, shall include BATES numbers.  The BATES numbers referred to shall, pursuant to Rule 33(d), identify documents from which the requested information can readily be identified.")  Although the code may refer to many variable names, SRA would have to manually read millions of lines of the code base to even identify all of the variable names used by the systems.  Since variables are subsumed within other variables during the calculation of the feature and within the search systems that use features, SRA would have to read substantially all of the calculation code and all of the serving code (most of the 160 million lines of code) just to produce a list of variable names for the features.  *See* Bosch Decl., ¶17.  The manual reading of all this code is not possible on the three search terminals provided by Facebook within the period allowed for SRA to update its infringement contentions.  This absurd burden seems hardly justified when Facebook conveniently maintains lists of its search features and its variable names and could easily provide this information.  *See* FB-SRA0000407 (referring to maintained lists of search features used by its systems).   *See* Bosch Decl., ¶15.  Furthermore, Facebook has specialized software that identifies features and tracks their use through the models and serving systems, meaning Facebook can easily provide the responsive information without the need for a lengthy source code review.  *Id.* at ¶17; *see also* FB-SRA0015778–79 & 15738.

Third, even if SRA had all of the variable names, the names themselves do not indicate which features use link data.  A name can literally be the number "15."  *See* Bosch Decl., ¶16.  Without knowing the type of data being loaded in the accessed data structures for the calculation of each feature, with the exception of certain specific cases, SRA cannot determine whether the feature uses link data by review of code alone.  **Thus, it is impossible to determine the response to Subpart C by review of the code alone**.  *Id.*  Again, Facebook engineers who design and operate the systems know exactly which features use "link data" as defined in Appendix A and can identify the relevant features with minimal effort.   The burden on the parties is in no way "substantially the same," and the records have not been identified to permit the "interrogating party to locate and identify them as readily as the responding party could" as required under 33(d).

**Subpart D** (as limited in SRA's May 24, 2013 letter) requires Facebook to identify "[e]ach feature or subsystem in the accused system that uses the signal feature, input, rank, algorithm or other factor."   "Use" must consider both direct use of the feature or other variable as well as indirect use.[3]  SRA believes that most of the uses of search features will be through the use of a score that incorporates the feature.  In an effort to focus this inquiry to the most relevant systems, SRA is willing to narrow this subpart to the following five basic "serving systems" (and their predecessors):[4]

1. People You May Know (*e.g.*, ███████████ and ███████████);
2. Advertising and Sponsored Link Serving Systems (*e.g.*, ███████████);
3. Search (*i.e.*, ███████████);
4. News Feed (*e.g.*, ███████████); and
5. Timeline (*e.g.*, ███████████).

Furthermore, SRA is willing to further limit the response to only "signals, features, inputs, ranks, algorithms or other factors" that use "link data" as defined in its May 24, 2013 letter (set forth in Appendix A) and those specifically enumerated in Appendix A.  Subpart D is critically important to enable SRA's infringement analysis of the code.  Typically, a search "feature" or other similar

[3] Indirect use is when the variable is subsumed or incorporated in another variable which is used by the system.

[4] SRA reserves the right to seek a response with respect to other systems at a later time if it proves necessary to its infringement analysis.  SRA hopes that a response with respect to these systems will prove sufficient for its infringement analysis but cannot be certain at this juncture.

-3-

HIGHLY CONFIDENTIAL – SOURCE CODE

analysis requested by Interrogatory No. 1 is calculated in one place in the code and then used by one of the above serving systems in another place in the code.  Although the "feature," rank or other value may have one variable name after it is calculated, this will change a multitude of times before it is used by the serving system.  This is because the feature value is combined with other feature values to create composite ranks and subsumed into other feature values and ranks.  *See* Bosch Decl., ¶16.  Features and other relevant values will be saved under one particular name and used under a different variable name.  By the time that the feature variable is used to serve results, it will have been subsumed into a multitude of different variable names. Thus, even if SRA was given all of the initial feature variable names, it cannot identify the systems that use them without input from Facebook and then manually following the trail from start to finish through hundreds of millions of lines of code—which is impossible in the allotted time without the specialized tools utilized by a Facebook engineer.  *See id.*  Also, where a variable name is simply saved under a different name, it would be impossible to track the variable names without an identification of each instance this happens.  Facebook has not provided this information*. Id.*

SRA has spent months trying to manually trace certain features to the systems that use those features to no avail.  *See* Bosch  Decl. at ¶8.  Facebook's search engineers know the basic systems (identified above) for which its "features" and other analyses are used and can easily provide information sought by this subpart.  Moreover, it has specialized systems that will draw a flowchart diagram of each "feature" and show how it is used by each subsystem including the serving systems.  *See* FB-SRA0015778 and Bosch Decl., ¶16.  Thus, Facebook can automatically generate diagrams that contain responsive information to subpart D without having to review the code for months and the burden is not substantially the same for the parties.  Moreover, Facebook has not provided the references as required under Rule 33(d) that contains responsive information.

Each of the above serving systems is millions, if not tens of millions, of lines of code.  In the case where the particular feature is not used, SRA will end up unnecessarily manually reading the entire code base of one or more of the above systems in attempt to locate something that is not there.  *See* Bosch Decl., ¶18.  If Facebook identifies the basic information requested in Subpart D (as well as subparts A and C), SRA will be more able to efficiently review the code without the extremely burdensome review of irrelevant systems

**Subpart G** of Interrogatory No. 1 requests Facebook to identify (by code citation) the location of the code that calculates the feature and the code that uses the feature by one of the above listed serving systems.  Given that months of SRA's time that has been wasted by the failure of Facebook to provide the relevant code and other information that actually uses the search features (Bosch Decl., ¶¶19–22), as well as the failure to provide other discovery responses including a response to Interrogatory No. 1, precise code citations will help cure the prejudice caused by the lost time in searching for code.  If the Court is not inclined to require Facebook to provide this information is should at least require Facebook to identify the variable that incorporates the "feature" as it is used by the final serving system.

SRA also requests that the Court have a hearing or telephonic conference on this subject matter of this motion.  This issue is of critical importance to SRA's ability to prosecute this case. SRA is prepared to present its expert who conducted the source code review in open court (or by telephone) so that the Court may inquire into SRA's efforts to locate responsive information and the sufficiency of the information supplied by Defendant.

Accordingly, SRA requests that the Court compel a narrative response to Interrogatory No. 1 (subparts A, C, D and G) as described herein.

**<u>Defendant's Position</u>**

HIGHLY CONFIDENTIAL – SOURCE CODE

I.       **Introduction**

        SRA's Interrogatory No. 1 is an impermissible attempt to shift onto Facebook the burden of proving SRA's infringement case.  SRA uses <u>one</u> single interrogatory to effectively demand: "Describe for us everything we might want to know about Facebook's source code for our infringement case, in each of seven different subject matters, for each and every signal or other factor relating to searching (including eight non-limiting examples), and for all Facebook software (including five non-limiting website features)."  SRA seeks the extraordinary relief of conscripting Facebook software engineers into service as unpaid consultants for SRA. This approach is not permissible under Federal Rule of Civil Procedure Rule 33, and is a proposition that this Court has repeatedly rejected. *See, e.g., Digital Reg of Tex., LLC v. Adobe Sys. Inc.*, No. CV 12-01971-CW (KAW), 2013 U.S. Dist. LEXIS 53238, at *13-15 (N.D. Cal. Apr. 12, 2013) (denying motion to compel defendant to identify "the specific source code that relates to the [accused] process"); *Apple Inc. v. Samsung Elecs. Co. Ltd.*, No. 12-CV-0630-LHK (PSG), 2013 WL 1563253, at *1-2 (N.D. Cal. Apr. 12, 2013) (denying motion to compel defendant Samsung "to connect the source code to the accused features").

        SRA argues that an answer under Rule 33(d) is not appropriate, but its argument fundamentally misses the point: no answer at all should be required in response to this highly objectionable interrogatory.  Interrogatory No. 1 is unduly burdensome, materially vague and ambiguous, and grossly compound.  SRA cites no case where any court has compelled an answer to an interrogatory even remotely similar to this one.  To grant SRA's motion would set harmful new precedent encouraging the abuse of overreaching, omnibus interrogatories.  While SRA claims it is willing to temporarily narrow Interrogatory No. 1 for the purposes of this particular discovery dispute, SRA reserves the right to fully enforce its improper interrogatory as it sees fit at some later time.  The Court should sustain Facebook's objections to Interrogatory No. 1 and deny SRA's motion.  SRA is free to withdraw its Interrogatory No. 1 and serve more narrowly tailored interrogatories; SRA can also obtain ample discovery by other means, which Facebook is readily providing notwithstanding SRA's mischaracterizations.

        SRA further suggests that its interrogatory seeks relevant information that cannot be ascertained from the code.  SRA only recently notified Facebook that it believes certain relevant code or data has not yet been produced.  Facebook is investigating, and if additional relevant documents are located that should be provided for SRA's review, then they will be provided and SRA can review them and develop its infringement case as it desires, under the Court's rules.

        Denying SRA's motion is also consistent with the unusual structure built into the schedule of this case, which is built around providing SRA with plenty of time to review Facebook's source code and develop its own infringement case.  SRA admitted at the case management stage that it cannot assess infringement without reviewing Facebook's source code, and that if it discovered any alleged infringement after reviewing the code, it would need to amend its contentions.  (*See* ECF No. 36.)  To accommodate SRA, Facebook agreed that SRA could have a full *seven months* to review the code before serving its amended infringement contentions.  Moreover, in an effort to avoid discovery disputes, from the beginning Facebook made available its complete website source code for SRA's inspection, rather than forcing SRA to individually request specific portions of the source code.[5]  Facebook also acceded to SRA's demand to permit three simultaneous

---

[5] SRA now *complains* that Facebook made "160 million lines of source code" available to it, blaming Facebook for the comprehensiveness of its production.

HIGHLY CONFIDENTIAL – SOURCE CODE

source code reviewers on three different computers—an extraordinary accommodation that Facebook has never made in any other case and that Facebook is not aware that any court has ever ordered. SRA has thus been reviewing Facebook's code, with multiple reviewers, for months now, with full access and ability to review the code.  Facebook has also produced extensive technical documentation separate from the code, much of which explains or discusses the operation of the code.[6]

Notwithstanding its plenary access to the code, SRA also served Interrogatory No. 1.  The interrogatory demands that Facebook provide narrative descriptions of vast swathes of its source code, for each and every different "version of a signal, feature, input, rank, algorithm or other factor considered" in ranking or providing search results, for seven distinct subparts of different subject matters, with no limitation whatsoever to the multiple features accused in SRA's infringement contentions or otherwise. (*See* Ex. A, Facebook's Responses and Objections to Interrogatory No 1.)  The interrogatory does not merely identify one specific feature accused in SRA's infringement contentions and ask where that feature is implemented in the code—which itself would be objectionable under this Court's precedent.  Rather, SRA essentially demands that Facebook's engineers spend weeks away from their jobs, creating a specially commented version of Facebook's code for SRA's benefit, to save SRA the trouble of attempting to prove up its own infringement case.  This is not a proper interrogatory.

Facebook served its objections to Interrogatory No. 1 on March 4, 2013, including that it is overly broad, unduly burdensome, vague and ambiguous, and compound.  (*See* Ex. A.)  Subject to these objections, Facebook also directed SRA to Facebook's source code pursuant to Rule 33(d).  (*Id.*)

Two months passed before SRA raised any issue with Facebook's objections.  After SRA apparently became frustrated that it could not find any infringement in the code, it has now demanded that Facebook substantially answer SRA's improper interrogatory.  SRA asks the Court to compel a partial answer to its improper interrogatory at this time, but clearly intends to demand more later.  Even if Interrogatory No. 1 were re-drafted to what SRA describes in its motion, SRA's demands remains unduly burdensome, compound, and materially vague and ambiguous. The interrogatory is wholly objectionable and SRA's motion should be denied.

## II.     Interrogatory No. 1 Improperly and Unduly Burdens Facebook with Developing SRA's Infringement Contentions.

SRA attempts to shift to burden of proving its infringement theory to Facebook by requiring Facebook to describe and cite the specific source code connected to an unspecified array of "each version of a signal, feature, input, rank, algorithm or other factor considered" relating to search results.  SRA claims that without a narrative answer to Interrogatory 1, it cannot build its infringement case, alleging that without a response, it would be forced to "manually read millions of lines of the code base to even identify all of the variable names used by the systems."  This Court recently rejected a nearly identical argument:

Apple seeks a "complete response" to its Interrogatory

---

[6] SRA vaguely alleges that Facebook's non-code technical document production is deficient.  Facebook strongly disagrees—it has diligently collected and produced a large volume of technical documents—but in any event, the only issue presently before the Court is Interrogatory No. 1.

HIGHLY CONFIDENTIAL – SOURCE CODE

Number 22 . . . . Interrogatory Number 22 asks Samsung to "[i]dentify from the Source Code produced [in response to two other Apple requests] all files that relate to the Accused Features and functionality of the Accused Samsung Products." The interrogatory continues:

> Such identification should include the name of the file, the engineers, designers and authors responsible for the file, the specific Accused Feature to which the identified file relates, and any differences between that file and the publicly available version of the source code for the Jelly Bean, Ice Cream Sandwich, Honey Comb, Gingerbread and FroYo versions of the Android operating system ….

> Samsung argues that Interrogatory Number 22 is Apple's attempt to impermissibly shift the burden to Samsung of identifying the source code connected to the accused features. *Apple responds that Samsung's production of the source code is so confusing that Samsung should have to connect the source code to the accused features*….

> [T]he court agrees that Apple's request impermissibly requires Samsung to prove Apple's case. Apple has made allegations regarding the features of Samsung's products; Samsung has made source code available for Apple to evaluate how those features operate. Samsung has no obligation to search its source code to extract the portions it thinks Apple thinks infringe—doing so in fact would lead to other problems regarding Samsung defining the scope of Apple's case.

*Apple*, 2013 WL 1563253, at *1-2  (emphasis added).  Like in *Apple v. Samsung*, SRA's interrogatory "impermissibly requires [Facebook] to prove [SRA's] case" and is an "attempt to impermissibly shift the burden … of identifying the source code connected to the accused features" onto Facebook.  *Id.*  Like Samsung, Facebook has "made its source code available for [SRA] to evaluate how those features operate."  *Id.*  Similarly, like Samsung, Facebook should not be forced to "search its source code to extract the portions" SRA might be interested in.  *Id.*  Like Apple, SRA is free to review the code, using the criteria and infringement theories it has in mind, and develop its case as it sees fit under the Court's rules.

Contrary to SRA's assertions above, Facebook is not required to provide source code citations identifying the accused features in the code.  *See Digital Reg*, 2013 U.S. Dist. LEXIS 53238, at *13-15 (denying motion to compel defendant to identify the specific source code that relates to the accused process).  Instead, courts consistently hold that plaintiffs, not defendants, must analyze source code and explain how it relates to the asserted claims or to existing infringement contentions.  *See, e.g.*, *Vasudevan Software, Inc. v. Int'l Bus. Machs. Corp.*, No. C09-05897 RS (HRL), 2011 WL 940263, at *6-8 (N.D. Cal. Feb. 18, 2011) (ordering the plaintiff to provide "pinpoint citations" in supplemental infringement contentions after source code was provided); *Big Baboon Corp. v. Dell, Inc.*, 723 F. Supp. 2d 1224, 1228 (C.D. Cal. 2010) ("Once source code has been provided to the plaintiffs, however, courts have required plaintiffs to supplement their infringement charges with pinpoint citations."); *Diagnostic Sys. Corp. v. Symantec Corp.*, Nos. SACV

HIGHLY CONFIDENTIAL – SOURCE CODE

06-1211 DOC (ANx), SACV 07-960 DOC (ANx), 2009 WL 1607717, at *6 (C.D. Cal. June 5, 2009) (compelling plaintiffs to provide amended contentions and discovery responses "expressly identifying and describing what, if any, source code for [defendant's] accused software products infringe" the asserted patents).

This is the normal process in patent litigation, including as reflected in the schedule in this case: the defendant produces source code to the plaintiff, and the plaintiff then provides infringement contentions reflecting its analysis of the defendant's source code. *See* Pat. L.R. 3-1(c); *Vasudevan Software,* 2011 WL 940263, at *6-8. Plaintiffs prosecute their allegations of patent infringement in this fashion every day.  For precisely this reason, courts have recognized that a citation to business records under Rule 33(d) is appropriate in such circumstances.  *See, e.g., Baxter Healthcare Corp. v. Fresenius Med. Care Holding, Inc.*, No. C 07-1359 PJH (JL), 2008 WL 5272186, at *2-3 (N.D. Cal. Dec. 15, 2008) ("[e]ssentially, Baxter asks Fresenius to prepare massive charts correlating the thousands of documents that are responsive to this request with each of the numerous product builds. The burden of that exercise, while massive and unnecessary, is the same for Baxter as it is for Fresenius"); *Berster Techs., LLC v. Christmas*, No. CIV 2:11-cv-1541-KJM-JFM, 2011 WL 4710801, at *3 (E.D. Cal. Oct. 4, 2011) (upholding use of business records option where "files are in electronic format and, as proven by plaintiff's own conduct, relatively easily searchable and, thus, not unduly burdensome"); *U.S. v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 30-31 (D.D.C. 2012) (holding that"[t]he relevant files are completely open to KBR's review" and therefore "the burden for ascertaining the answer is substantially the same for either party").

Rule 33 is not designed to shift the burden of proof from plaintiffs to defendants. The proper course remains the one embodied in the case schedule.  SRA – not Facebook – is the party that must decide how SRA contends Facebook's software and features might infringe the asserted claims, and is the party that needs to review the code and develop its case accordingly.

SRA has not cited to a single case compelling an answer to an interrogatory even remotely analogous to SRA's Interrogatory No. 1, and the cases SRA does cite are inapposite.  In *FatPipe Networks*, plaintiff and patentee FatPipe was ordered to identify the portions of source code *in its own device* it alleged practiced *its own asserted patent*. *FatPipe Networks India Ltd. v. XRoads Networks, Inc.*, No. 2:09-cv-186, 2010 WL 3064369, at *4-5 (D. Utah Aug. 3, 2010).  Therefore, FatPipe was ordered to parse and understand its *own* legal contentions regarding the patent in suit, and not, as demanded by SRA in the present dispute, to do the work of the *opposing* party who carries the burden of proof.  Moreover, the interrogatories at issue were narrowly focused on one patent claim, in stark contrast to SRA's omnibus interrogatory.  *FatPipe,* 2010 WL 3064369 at *4.

Further, *Avila v. Willits Envtl. Trust*, C 99-3941 SI, C 06-2555 SI, 2008 WL 2705015 (N.D. Cal. July 9, 2008) has nothing to do with responses relating to source code.  In *Avila*, the defendants propounded narrow discovery requests asking for plaintiff-specific information regarding each plaintiff's alleged exposure to hazardous substances and each plaintiff's health care records, to which all of the plaintiffs provided the same joint, generic response, citing massive amounts of irrelevant documents.  *Id*. at *2.  Again, the plaintiffs were ordered to parse and understand their *own* legal contentions and related documents regarding their *own* claims, rather than prove the opposing party's infringement theories.

SRA's citation to *BigBand Networks* and *LaserDynamics* are equally distinguishable.  In *BigBand*, the disputed interrogatory merely requested identification of source code for each discrete commercialized product.  *BigBand Networks, Inc. v. Imagine Commc'ns Inc.*, No. 07-351-JJF, 2010 WL 289288 at *2 (D. Del. July 20, 2010).  In *LaserDynamics,* to settle a discovery dispute, the defendants agreed to identify certain discrete disc drive functionalities in the source

-8-

HIGHLY CONFIDENTIAL – SOURCE CODE

code for the accused drives, which was not the subject to the Court's ruling.  In resolving the remaining discovery disputes, the court ordered an explanation of "how certain aspects of the defendants' accused disc drives function" – not a comparison of the accused products to the patent claim limitations.  *LaserDynamics, Inc. v. ASUS Computer Int'l*, No. 2:06-CV-348, 2009 U.S. Dist. LEXIS 3878, at *7-8 (E.D. Tex. Jan. 21, 2009).  Neither decision supports the extraordinary relief that SRA seeks here, where SRA apparently contends that the asserted claims run through the entirety of Facebook's source code.

SRA also cites *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, No. C-06-01665 PJH (JCS, No. C-06-2915 PJH (JCS), 2007 WL 1514876, at *5 (N.D. Cal. May 21, 2007), for the proposition that any interrogatory response shall use Bates numbers to identify the requested information.   That case has nothing to do with source code.  Consistent with *Sun Microsystems*, when Facebook has produced non-code documents, they were produced with Bates numbers.

SRA's position below that Patent Rule 3-4 requires Facebook to create a source code "cheat sheet" identifying where each variable is used throughout the code is nonsense. Facebook's source code is sufficient to show the operation of the aspects or elements of the accused instrumentalities under Patent Rule 3-4, which was all SRA was entitled to at that stage of the litigation.  *See*, *e.g.*, *Pragmatus AV, LLC v. Facebook, Inc.*, Case No. 5:11-cv-2168 EJD (PSG), slip. op. at 3 (N.D. Cal. July 5, 2012) (Grewal, M.J.).  Accordingly, SRA's citations to *Nova Measuring* and *McKesson Info.*, cases that concern document production, are misplaced and confuse the issue.  Neither of these cases deals with overbroad and burdensome interrogatories. *See Nova Measuring Instruments Ltd. v. Nanometrics, Inc.*, 417 F. Supp.2d 1121, 1122 (N.D. 2006) ("Before the court is plaintiff Nova Measuring Instruments' motion to compel defendant Nanometrics' **production of documents** pursuant to Patent L.R. 3-4."); *McKesson Info. Solutions LLC v. Epic Sys. Corp.*, 495 F. Supp. 2d 1329, 1334 (N.D. Ga. 2007) (noting that defendant's provision of pre-existing administrative guides and training guides for commercial software product constituted "the source code documentation requested by plaintiff").  Neither of these cases suggests that Facebook should be forced to respond to SRA's *interrogatory*, or have its engineers engage in informal meetings with SRA.

### III.     Interrogatory No. 1 Is Insolubly Vague and Ambiguous.

In addition to its undue breadth and burden, Interrogatory No. 1 is simply not well-crafted for an interrogatory relating to source code, and cannot be reasonably answered by Facebook.  The interrogatory, even as temporarily "narrowed" for purposes of SRA's motion, uses vague and ambiguous ordinary words that do not clearly map to any specific source code.  Only SRA knows exactly what it considers "direct or indirect" "use," "names," "versions," "signal," "input," "other factor," "considered," and the like, in the context of its desired infringement theories.  Even when it re-defines its interrogatory to "link data," its definition remains vague and ambiguous (as well as overbroad and burdensome)—what exactly should be deemed "data that is derived from, incorporates or uses information (directly *or indirectly*)" an open-ended list of data sources?  Any answer that Facebook provided would inevitably be scrutinized or challenged as allegedly incomplete or inaccurate.  *See Apple v. Samsung*, 2013 WL 1563253 at *2 ("Samsung has no obligation to search its source code to extract the portions it thinks Apple thinks infringe—*doing so in fact would lead to other problems regarding Samsung defining the scope of Apple's case*.") (emphasis added).  SRA should simply review the code and develop its own contentions, as plaintiff-patentees routinely do.

### IV.     Interrogatory No. 1 Is Grossly Compound.

Interrogatory No. 1 is also an improper attempt to pack a huge number of different

HIGHLY CONFIDENTIAL – SOURCE CODE

interrogatories into one compound interrogatory.  Fed. R. Civ. P. 33(a) states that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, *including all discrete subparts*." (emphasis added).  It is black-letter law that "a party cannot avoid the[se] numerical limits by asking questions about distinct subjects, but numbering the questions as subparts." 7-33 Moore's Fed. Prac. Civ. § 33.30[2].  Accordingly, this Court has held that interrogatories seeking information about different accused products constitute multiple discrete subparts.  *See Collaboration Props., Inc. v. Polycom, Inc.*, 224 F.R.D. 473, 475 (N.D. Cal. 2004); *Rambus, Inc. v. NVIDIA Corp.*, Nos. C-08-3354-SI, C-08-05500-SI (N.D. Cal., Aug. 24, 2011) ("Even assuming for a moment that a single interrogatory could permissibly ask for information about all 300 accused products, Rambus's interrogatories that do so also ask about multiple distinct subjects (i.e., *distinct subparts*) regarding each product.") (emphasis added).  Here, Interrogatory No. 1 requests information in seven distinct subparts, for an *unlimited* number of different "factors" throughout all of Facebook's software, merely "exemplified" by eight factors and five website functions.  Even its "narrowed" version identifies eighteen different features, demanding information for each of several different subject matters.  This is clearly an abuse of Rule 33, and thus Facebook's objection should be sustained.

## V.      Facebook Has Not Withheld Code or Tools or Refused Deposition.

Furthermore, SRA alleges that Facebook is resisting "all" efforts to provide relevant information to review its source code by "withholding" code and "specialized" search tools, refusing to provide "easily" obtainable information or informal engineer interviews, and refusing to sit for deposition.   This is all incorrect.  After four months of review, SRA only recently raised the issue of purportedly missing code, and Facebook has been working diligently to determine if there is even an issue with the provided code in the first instance; the code Facebook has provided is the same code it has provided in many other patent cases.  In any event, SRA's gripe underscores why its motion should be denied—to the extent any relevant code was not produced, Facebook will investigate and timely produce it and SRA can review as it sees fit. In addition, while SRA complains of having to "manually review" the code, Facebook has promptly provided all of the software search and review tools SRA has requested.  If SRA feels that there are additional search or review tools which will make its review less "manual," it remains free to request them.

SRA also alleges that *some* of the information it requests could be "easily" obtained using internal Facebook software tools.  If Interrogatory No. 1 had been limited to information that could be easily retrieved and reported, for one properly-tailored subject matter, then Facebook would have had a different response. But SRA's Interrogatory No. 1, even as temporarily "narrowed," extends far beyond any easily-obtainable information—for example, SRA demands that Facebook's engineers spend huge amounts of time away from their jobs, tracking down "[a]ll names, versions, variables or other identifiers used to refer to" a long list of vague and ambiguous software features (subpart A) and providing "pinpoint citations" to the code for a vast array of unclearly-defined functionality (subpart G).  SRA, not Facebook, is the party that should review the code and related materials and develop SRA's infringement case as desired.

SRA further criticizes Facebook for refusing to make available its engineers for informal, off-the-record interviews by SRA's counsel and paid consultants.  No Federal Rule or other authority requires such imposition on Facebook's busy employees.  SRA has plenty of allotted hours to take depositions in this case.

Finally, SRA's claim that Facebook has refused a deposition is false.  In violation of Local Rule 30-1, SRA unilaterally noticed a deposition of Facebook for June 13, 2013,

HIGHLY CONFIDENTIAL – SOURCE CODE

on an impossibly broad and burdensome set of topics similar to its Interrogatory No. 1, without conferring in advance on a mutually agreeable date.  June 13 has not even passed, and Facebook is working on scheduling deposition time in the near future.

For the foregoing reasons, SRA's motion should be denied.

### SRA's Reply

Interrogatory No. 1 (subparts A, C, D, G) does not seek to "shift the burden to Facebook" for an infringement analysis as contended by Facebook, but rather it seeks the basic information necessary for SRA to decipher its code so it conduct its own infringement analysis.  Nor does it require the Defendant to compare its code to any claim limitations.  It is well settled that the Defendant must give the "tools necessary to allow the receiving party to decipher the documents and discern which documents refer to which elements or aspects of the accused instrumentalities."  *Nova Measuring Instruments Ltd. v. Nanometrics, Inc*., 417 F. Supp.2d 1121 at *1223 (N.D. 2006)(ordering a party to identify where in the code accused functionality may be found and citing *Cryptography Research, Inc. v. Visa Int'l Serv. Ass'n*, 2005 WL 1787421 at *2 (N.D.Cal.2005); *McKesson Info. Solutions LLC v. Epic Sys. Corp.*, 495 F. Supp. 2d 1329, 1334 (N.D. Ga. 2007) (noting that defendant has "a good faith obligation to provide the types of information that will enable the party asserting infringement to reasonably determine the operation of the accused device or method *without undue burden or expense*.").

Facebook's response fails to sufficiently rebut the fact that it is **impossible** to derive the responsive information from review of the source code alone (even assuming that they provided all of the actual relevant code, which they still have not done).  Nor does it rebut the fact that it its engineers have (1) feature lists, (2) specialized tracking tools, and (3) internal knowledge of the drafters to easily respond to Interrogatory No. 1 without having to read all of the source code— thereby failing to establish that the burden on the parties is "substantially the same," and that the records have been identified to permit the "interrogating party to locate and identify them as readily as the responding party could" as required under Rule 33(d).  *See* FB-SRA0000407 (list of features produced by Facebook engineer), 15738 (Facebook tool for producing lists of features), 15778 (Facebook tool for tracing use of features and code and automatically generating diagrams of same); *see also* Bosch Decl., ¶¶15–16.

This alone reveals violations not only of Fed. R. Civ. P 33(d), but also of its obligations under Patent Rule 3-4 requiring "documentation *sufficient to show the operation* of any aspects or elements of an Accused Instrumentality."  One cannot review the source code to conduct an infringement analysis without knowing the variables used by the (1) calculation systems and (2) serving systems that correspond to the use of the features that incorporate link data.  Since source code alone does not contain this information, Defendant has failed to disclose the operation of the accused instrumentality.  Irrespective of its complaints about the breadth of Interrogatory No. 1, it was required to provide this information sought by Interrogatory No. 1 to make its code intelligible and capable of being reviewed for infringement.

Facebook's complaints about the burden or any ambiguity of Interrogatory No. 1 is also ill founded.  Even when SRA identified the **exact** feature name, Facebook refuses to identify the corresponding variables and the systems that use the feature.  *See, e.g.*, elements 2, 4, and 14–18 of Appendix A.  When SRA offered its consultants to further clarify to SRA's requests to Facebook's technical personnel, Facebook refused to meet.  Although SRA thinks that its interrogatory is neither burdensome nor vague, it reduced its request to that set forth in Appendix A for just five serving systems, significantly reducing the burden.  Still, Facebook would not disclose this information or put up a witness for 30(b)(6) deposition on this subject matter.

-11-

HIGHLY CONFIDENTIAL – SOURCE CODE

Dated:  June 7, 2013

By:  /s/ *Victor G. Hardy*
     VICTOR G. HARDY

VICTOR G. HARDY (admitted *pro hac vice*)
*vhardy@dpelaw.com*
**DINOVO PRICE ELLWANGER & HARDY LLP**
7000 North Mopac Expressway, Suite 350
Austin, Texas  78731
Telephone:     (512) 539-2626
Facsimile:     (512) 539-2627

W. PAUL SCHUCK (Cal. Bar No. 203717)
*pschuck@bzbm.com*
**BARTKO ZANKEL BUNZEL & MILLER**
One Embarcadero Center, Suite 800
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile: (415) 956-1152

Attorneys for Plaintiff
SOFTWARE RIGHTS ARCHIVE, LLC

Dated:  June 7, 2013

By:  /s/ *Heidi L. Keefe*
     HEIDI L. KEEFE

HEIDI L. KEEFE (Cal. Bar No. 178960)
hkeefe@cooley.com
MARK R. WEINSTEIN (Cal. Bar. No. 193043)
mweinstein@cooley.com
LOWELL MEAD (Cal. Bar No.  223989)
lmead@cooley.com
**COOLEY LLP**
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

Attorneys for Defendant
FACEBOOK, INC.

-12-

HIGHLY CONFIDENTIAL – SOURCE CODE

**Appendix A**

Based upon its review SRA has identified the following features to Facebook for a response to Interrogatory No. 1:[7]

1.  Any feature that uses LINK DATA in its computation.

2.  ██████████, including all variants (*e.g.,* ████████████████████████████████ ));

3.  ████████████████████████████████████████████████████ data structures.  Refer to ██████████████████ ;

4.  Number of Mutual Friends, including ██████████████████████████████████ )

5.  Degree of Separation, Connection Index or any other value reflecting and/or incorporating the distance between end-user profiles.  For example, refer to Facebook Patents 8,239,364, 5:41-51 and 7,788,260, 1:50-59;

6.  EdgeRank, *see* FB-SRA-13986; and GraphRank, *see* http://www.insidefacebook.com/2011/12/27/edgerank-and-graph-rank-defined/;

7.  ██████████, *see* FB-SRA0014988.

8.  PageRank.  For example, refer to ██████████████████████ and FB-SRA0015191;

9.  Scores, values, ranks related to similarity factors.  For example, refer to ████████████████████████████████████████████ ;

10. ██████████████ including, but not limited to, those considering the number of overlapping friends, click through data, likes and/or comment data. For example, as used in the process of ██████████████ , *see* FB-SRA-13.  *See also* FB-SRA-11, FB-SRA-101 and Facebook Patent Application 2008/0040475;

11. Number of Overlapping Fans and variants.  For example, in the calculation of ██████ , *see* FB-SRA-11;

12. Any algorithm, feature or system that replaced EdgeRank or otherwise uses ██████ in the ranking of New Stories;

---

[7] This list includes the features and other values identified in May 3, 2013 letter and May 24, 2013 letter as well as those identified by Facebook in its May 28, 2013 Email.  It also identifies Model Rank which was disclosed in Facebook's June 1, 2013 production.

JOINT DISCOVERY REPORT #1:  INTERROGATORY NO. 1
Case No. 12-CV-3970 RMW

HIGHLY CONFIDENTIAL – SOURCE CODE

13. "Friend" based features including ███████████████), ████████
███████████) including "██████████" and variants using any signal, feature, rank, and/or score including, but not limited to ████████████████████, Number of Mutual Friends and Degree of Separation.  Refer to FB-SRA-13499.  This also includes ████████████████████████████)

14. Features that use click thru data such as ██████████████████████)

15. █████████████████████████ and variants (*see* ██████████████)

16. ████████████████████ and variants (*see* ████████████)

17. "Like" based features and variants including ████████████████████
███████████████████████████████████████████████
███████████████████████████

18. "Comment" based features including ████████████████████
████████████████████████████)

SRA defines LINK DATA as set forth in its May 24, 2013 letter and is reproduced here:

"Link data" refers to data that is derived form, incorporates or uses information (directly or indirectly) from:

- Facebook's Friend table and other data structures relating to friend relationships (*see* http://developers.facebook.com/docs/reference/fql/ friend/ ("An FQL table that can be used to return a list of a user's friends or to show whether two users are friends.")),
- Facebook's Fan table and other data structures relating to fan relationships (*see* http://developers.facebook.com/docs/repage_fan/),
- Facebook's Like table and other data structures relating to likes (*see* http://developers.facebook.com/docs/reference/fql/like/),
- Facebook's number of Mutual Friends feature,
- ████████████████) feature variants,
- or any information concerning explicit references, or hyperlink references between objects on the Facebook Social Network.

Features that SRA believes fall within the above definition include data stored within the variables: ████████████████████████████████████ corresponding to friend, fan, like and other associative relationships.